STATE of Wisconsin, Plaintiff-Respondent,

v.

Thomas P. TECZA, Defendant-Appellant.†

Court of Appeals

*No. 2007AP1783–CR. Submitted on briefs December 12, 2007.*
*—Decided April 23, 2008.*

## 2008 WI App 79

(Also reported in 751 N.W.2d 896.)

† Petition to review denied 7/28/08.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Timothy P. Swatek of Harrison, Williams, McDonell & Swatek, LLP*, Lake Geneva.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *Phillip A. Koss*, district attorney of *Elkhorn*, and *Steven P. Means*, assistant attorney general, and *J.B. Van Hollen*, attorney general.

Before Brown, C.J., Anderson, P.J., and Snyder, J.

¶ 1. ANDERSON, P.J.[1] Thomas P. Tecza appeals from a denial of his motion to dismiss second-offense drunk driving charges. Tecza disputes the circuit court's conclusions that the roadways of a gated community, Geneva National Community, were held open to the public for the use of their motor vehicles. We reject Tecza's challenge because on any given day any licensed driver in a motor vehicle was free to use the roadways within the community.

¶ 2. In the early morning hours of October 23, 2005, private security personnel for Geneva National Community, located in Walworth county's town of

---

[1] This appeal from conviction for operating while under the influence, second offense, was originally a one-judge appeal; on our own motion, this case was converted to a three-judge appeal, Wis. Stat. Rule 809.41(3) (2005–06), because of the significant issue raised.

All references to the Wisconsin Statutes are to the 2005–06 version unless otherwise noted.

Geneva, requested assistance of town police officers to deal with a driver, later identified as Tecza, sitting in a running vehicle at the corner of Golfview Drive and Geneva National Avenue in the Community. As a result of contact between police officers and Tecza, an amended criminal complaint charging one count of operating a motor vehicle while under the influence of an intoxicant, second offense, in violation of WIS. STATS. §§ 346.63(1)(a) and 346.65(2), and one count of operating a motor vehicle with a prohibited alcohol content, second offense, in violation of §§ 346.63(1)(b), 346.65(2) and 340.01(46m), was issued.

¶ 3. Tecza filed a motion to dismiss the complaint.[2] The basis of the dismissal motion was the assertion that at the time of his arrest, he was not operating a vehicle on premises "held out to the public for use of their motor vehicles" as required by WIS. STAT. § 346.61.[3] According to the supporting affidavit,

---

[2] Tecza styled his motion as seeking to suppress all evidence obtained by the State or, in the alternative, to dismiss all charges against him. However, Tecza is not entitled to suppression of the evidence. "Suppression of evidence is 'only required when evidence has been obtained in violation of a defendant's constitutional rights, or if a statute specifically provides for the suppression remedy.' " *State v. Keith*, 2003 WI App 47, ¶ 8, 260 Wis. 2d 592, 659 N.W.2d 403 (citation omitted). Whether or not the roadways of the Community are held open to the public is not an issue of constitutional proportion nor does any statute provide for suppression if conduct on a private roadway is charged as a crime. Consequently, we will treat Tecza's motion as seeking dismissal solely for failure to state a crime.

[3] WISCONSIN STAT. § 346.61 states:

**Applicability of sections relating to reckless and drunken driving.** In addition to being applicable upon highways, [WIS. STAT. §§] 346.62 to 346.64 are applicable upon all premises held out to the public for use of their motor vehicles, all premises provided

Geneva National Community is a condominium project in the town of Geneva; the plat for the Community identifies Golfview Road as common area for Condominium No. 35 and access to Golfview Road is from Geneva National Avenue. The affidavit establishes that the "DECLARATION OF COVENANTS, CONDITIONS[,] RESTRICTIONS AND EASEMENTS FOR THE GENEVA NATIONAL COMMUNITY," recorded in the Walworth county Register of Deeds office describes Geneva National Avenue as a "Private Roadway." Finally, Tecza's counsel, the affiant, described his personal experience in entering the Community:

> That in my practice of law in Walworth County I have had numerous clients who have resided in Geneva National. That access to the residential portions of the development, including the area of the stop and arrest in this case, requires access through an initial Security gate area in which a guest card is given. One must then pass through a second gate to enter the home site areas. Property owners are given [a] card to operate the security gates.

¶ 4. At an evidentiary hearing, the court heard the testimony of the arresting officer and a real estate broker, developer and home builder with professional experience in the Geneva National Community. The evidence presented in Tecza's affidavit and at the hearing is undisputed and establishes that the Community is a condominium development of 1920 approved units with between 1200 and 1500 units constructed. While

by employers to employees for the use of their motor vehicles and all premises provided to tenants of rental housing in buildings of 4 or more units for the use of their motor vehicles, whether such premises are publicly or privately owned and whether or not a fee is charged for the use thereof. Sections 346.62 to 346.64 do not apply to private parking areas at farms or single-family residences.

most of the units are owner-occupied, there are rental units managed by agencies not connected with the Community. In addition to the residential units, the Community includes a golf course, a clubhouse with a restaurant used for wedding receptions and meetings, and the Hunt Club restaurant, the facilities of which are open to the public.

¶ 5. The Community includes about twenty miles of roadway, consisting of both boulevards and standard sixty-six-foot-wide roads.[4] It is unknown if the roadway meets the construction standards for public roadways but, to the naked eye, they do. The town of Geneva police department patrols the roadways in the Community and enforces the traffic regulations.

¶ 6. The main entrance to the Community has a usually manned security station with gates. To use the main entrance, a driver must either have a sticker on his or her vehicle or stop and get a pass from the private security guard. There is a gated rear entrance to the Community and within the Community there are additional unmanned security gates. To use these gates, a driver must either wave a security card in front of a sensor or wait for a security guard at the main entrance to remotely raise the gate. There are no "No Trespassing" or similar signs limiting access to the Community posted at any entrance. Similarly, there is no evidence of a fence or wall surrounding the Community.

¶ 7. The undisputed evidence establishes that there is access for nonresidents, including postal employees, cable television employees, contractors, food service employees, repair persons, and newspaper delivery persons. All that is necessary for entrance is to

---

[4] The statutorily presumptive width of highways in Wisconsin is sixty-six feet. WIS. STAT. § 82.31.

stop at the security station, state the purpose of the visit and obtain a pass. Community residents cannot bar any nonresident from entry. The public is also admitted to show and view houses for sale, watch fireworks, play golf, attend weddings, and to just look around.

¶ 8. On October 23, 2005, when responding to the private security guard, the arresting officer had to pass by the main security station but did not have to pass any other manned or unmanned gate. The officer first made contact with the private security guard and Tecza on Golfview Road, the road that Tecza lived on.

¶ 9. At the conclusion of the hearing, the circuit court ordered written argument from the parties. In an oral bench decision, the circuit court denied Tecza's motion to dismiss. The court concluded, as a matter of law, that the intersection of Golfview Road and Geneva National Avenue was "not a private area where the public is excluded as in *City of Kenosha v. Phillips*, 142 Wis. 2d 549[, 419 N.W.2d 236 (1988)]." The court reasoned:

> The main issue I think is whether the public is excluded as it was in the Kenosha case where evidently the lot was—the public was prohibited from using that lot, only employees of American Motors. The facts of this case show that public can attain admission to this area. They have to state their reason for attending, and the homes are often serviced by local vendors, access to the golf course area which is not apparently beyond one of the check points. It is open to the public. There are some rental units there.

> The check points are used mostly to determine if the person has a valid reason for being there. So the public per se is not excluded and often do travel those roads.

¶ 10. After the motion was denied, Tecza entered a "no contest" plea to a charge of operating a motor vehicle while under the influence of an intoxicant, second offense, in violation of Wis. Stats. §§ 346.63(1)(a) and 346.65(2). Following conviction, he appeals the denial of his motion to dismiss.

¶ 11. The only issue on appeal is whether the roadways within the Community are "held out to the public for the use of their motor vehicles." To answer this question we must apply the statute to the undisputed facts. This is a question of law which we review de novo. *City of La Crosse v. Richling*, 178 Wis. 2d 856, 858, 505 N.W.2d 448 (Ct. App. 1993).

¶ 12. Relying upon *Phillips* and *Richling*, Tecza asserts that because a driver has to pass one or more security stations to get to Golfview Road and Geneva National Avenue, the Community or "premises" is "not held out to the public" and is designated for use by a "defined limited portion of the citizenry"; therefore, the OWI laws are not applicable. He argues that, given the security stations, access is clearly not freely given nor available. He contends that public policy arguments that because of the size of the Community the OWI laws should apply are best left to the legislature.

¶ 13. The State also relies on *Richling* but urges us to reach an opposite result. The State argues that under *Richling* the test is whether virtually anyone with a driver's license and access to a motor vehicle could use the streets of the Community, and, based on the undisputed facts, the State concludes the answer is "yes." The State distinguishes *Phillips* on its facts, in that case, there was signage restricting use of the parking lot to American Motors employees. In this case, there is no signage restricting access to the Community.

¶ 14. During the hearing, the Community was referred to as a "gated community." While that term is not defined in the Wisconsin Statutes or case law, it is defined in other professional literature.

Gated communities come in three different types: lifestyle communities, elite communities, and security zone communities. All of these community types differ in their inhabitants, but they all serve the same basic service, to keep unwanted individuals out. Lifestyle communities provide security and separation for leisure activities and the amenities offered inside. These lifestyle communities include retirement communities, leisure communities, and suburban "new towns." The lifestyle communities offer residents the chance to engage in a wide variety of activities close to their own homes. Activities inside these communities can include golf courses, horseback riding, and many other "leisure" activities for residents.

The second type of a gated community is known as an elite community. "These communities are primarily occupied by the rich and famous, the top one fifth of Americans." These developments focus on exclusion and status. In these communities, the primary focus is on image. The gates represent a barrier of status to all who are outside and looking in. Security is another major concern due to the resident's status within the community. Like lifestyle communities, the developers of the elite communities build walls and gates as a marketing strategy.

The final type of gated community is the security zone community. Unlike the other two communities, security zone communities are gated by the residents themselves and can somewhat represent a "fortress" mentality. "The fortress mentality is perhaps clearest here, where groups of people band together to shut out their neighbors." Many of these new communities are located in inner city and lower income neighborhoods where

402

the residents see crime increasing. The fear of crime and outsiders is the major reason that these people gate themselves in.

Edward J. Drew & Jeffrey M. McGuigan, *Prevention of Crime: An Overview of Gated Communities and Neighborhood Watch* (2006), http://www.ifpo.org/articlebank/gatedcommunity.html (last visited Mar. 19, 2008). From these definitions, it is evident that the Geneva National Community is a "lifestyle community" offering golf and other leisure activities to the residents.

¶ 15.　We first consider *Phillips*. Phillips was found incapacitated in his car in a parking lot owned by American Motors and posted with signs limiting use to employees. *Phillips*, 142 Wis. 2d at 552. The circuit judge dismissed the charges, holding that the parking lot was not held out to the public but its use was limited, by signage, to American Motors employees. *Id.* at 553. The supreme court affirmed the circuit court. *Id.* at 552. The court rejected any test on what is "holding out to the public" that focuses on physical accessibility. *Id.* Rather, the court concluded the proper test of "holding out to the public" focuses on the intent of the owner:　"Is it the intent of the person or corporation in control of the premises that they be available to the public for the use of their motor vehicles?" *Id.* at 557.

¶ 16.　The Court pointed out that this was to be a case-by-case test:　"Holding out can be by action or inaction that would make the intent explicit or implicit. Either action or inaction might, in appropriate circumstances, constitute a holding out to the public . . . ." *Id.* at 558.

¶ 17.　We consider *Richling* next. Richling was arrested for drunk driving after colliding with another vehicle in the parking lot of Schmidty's Bar & Restau-

rant. *Richling*, 178 Wis. 2d at 857. The owner of the lot averred that the lot was for the sole use of his patrons and that he had never had an unauthorized car towed from the lot. *Id.* at 857–58. Additionally, there was no signage restricting the use of the lot to a defined and limited portion of the public. *See id.* at 857. Richling was convicted of drunk driving after the circuit court rejected his argument that the parking lot was not held out the public. *Id.* at 858.

¶ 18. After discussing *Phillips*, we affirmed. We read *Phillips* as inquiring into whether the premises were available for use to the public or "to a defined limited portion of the citizenry." *Richling*, 178 Wis. 2d at 859–60. With this focus on the public, we wrote:

> We believe the appropriate test is whether, on any given day, potentially any resident of the community with a driver's license and access to a motor vehicle could use the parking lot in an authorized manner.

*Id.* at 860. Using this test, we distinguished *Richling* from *Phillips* by pointing out that in the latter, American Motor employees were a "defined, limited portion of the citizenry." *Id.* at 860–61.

¶ 19. Considering the facts of this case in light of the *Richling* test, we conclude that the roadways of the Community were held out for use of the public as a whole. The undisputed evidence establishes that any person with a driver's license and access to a motor vehicle was permitted to use the Community's roads; on a daily basis postal employees, cable television employees, contractors, food service employees, repairpersons, and newspaper delivery persons were granted access to the Community. In addition, members of the general public were given access to the Community's roadways

to show and view houses for sale, watch fireworks, play golf, attend weddings, and to just look around.

¶ 20. There is no evidence the Community made any attempt to limit access to residents only, who would constitute a "defined, limited portion of the citizenry." There is no signage, fence or wall restricting entry. It is clear that the Community's residents permitted the public unimpeded access in order that the residents could pursue their leisure activities and depend on other members of the public to fulfill their daily needs. It is equally clear that a purpose of the main security station was to facilitate entry into the Community for those without security passes or security stickers.

¶ 21. The Community also took action to hold its roadways out to the public for unrestricted use by permitting the Geneva police department to patrol the roadways and enforce the traffic code. *See Phillips*, 142 Wis. 2d at 558. A police presence on the roadways of the Community is an indication of an explicit intent to hold the roadways out to the public for the use of their vehicles. *See id.* If the roadways were private property, there would be no reason to expend taxpayer dollars to enforce municipal and state laws on the roadways of the Community.

¶ 22. We affirm. The roadways of the Geneva National Community were "held out to the public for use of their motor vehicles" because on any given day any licensed driver could enter the Community unchallenged; therefore, the drunken driving law of the State applies as provided in Wis. Stat. § 346.61.

*By the Court.*—Judgment affirmed.